* "Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B. through E. of the Discussion.
[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
OPINION
 PROCEDURAL BACKGROUND On September 26, 2005, an amended information was filed charging appellant Julio Henry Tena with corporal injury to Sonia Verdugo, the mother of his child (Pen. Code, § 273.5, subd. (a)).[1] It also alleged that appellant had suffered a prior conviction for the same offense within seven years (§ 273.5, subd. (e)(1)), two prior convictions within the meaning of section 667.5, subdivision (b), and two prior convictions for purposes of the "Three Strikes" law (§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Appellant pleaded not guilty to the charge and denied the special allegations.
 Trial was by jury. On September 28, 2005, the jury found appellant guilty as charged. Following a bench trial, the trial court found true the allegations that appellant had a prior misdemeanor conviction for corporal injury to a coparent, two prior prison terms within the meaning of section 667.5, subdivision (b), and one prior "strike" under the "Three Strikes" law. On March 7, 2006, the trial court sentenced appellant to 12 years in state prison, and awarded 300 days in presentence custody credits.
 FACTUAL BACKGROUND A. Prosecution Evidence
 At trial, the key prosecution witness was Sonia Verdugo, who testified as follows: She and appellant had been together for seven years, and had two *Page 724 children. As of April 5, 2005, they no longer lived together, but saw each other on a regular basis.
 Between 9:30 and 10:00 p.m. on that date, appellant drove in Verdugo's car to pick her up at Intercoast College, where she attended classes in alcohol and drug counseling. He was dressed up, and told her that he was going to a barbecue, using her car. She responded, "No, you're not." When appellant removed the keys from the ignition and said in abusive language that she was "going nowhere," she became scared and walked through the parking lot towards a nearby street. Appellant pursued her on foot, said, "Get back into the car, fucking bitch," and hit her on her left cheek.
 Verdugo reached the street and turned toward a relative's house. Appellant retrieved the car and followed her, telling her in abusive language to get into the car. He reappeared on foot before her, and they argued. Verdugo kicked him on the shin to move him out of her path, and she fled past him. After some distance, she hid behind some bushes in front of a house.
 When Verdugo judged that appellant had driven past her location, she stood up and stumbled, thereby spraining her ankle. Appellant approached her on foot, and they resumed arguing. He taunted her with the car keys by dangling them out of her reach. When she grabbed the keys away from him, he wrestled or tripped her to the ground, jumped on top of her, and hit her shoulder. Appellant then took back the keys and got off of her.
 Verdugo again walked toward her relative's house, crying and asking for help. Appellant repeatedly urged her to get into the car and said, "They're going to call the cops." She decided to enter the car because she was in pain. As they sat in the car, a police vehicle stopped and two officers approached them. Appellant told Verdugo — who had been arrested for drug use and had completed a court-ordered drug program — not to say anything to them because he had drugs in the car. She told the officers that she had hurt her ankle, and they advised her to go to a nearby hospital. She did not complain about appellant's conduct because she feared him.
 Appellant drove Verdugo to her house, retrieved her medical insurance card, and took her to a hospital. On the way to the hospital, he apologized for his conduct. When Verdugo was admitted to the hospital, she did not complain about appellant because he was present, and she was fearful of him. After he left, she remained silent about his conduct because she felt embarrassed and stupid. *Page 725 
 On April 6, 2005, Verdugo complained to the Temple City Sheriff's Department that appellant had stolen her car. Appellant was briefly arrested and then released. On April 9, 2005, she registered a complaint about appellant's physical abuse with the West Covina Police Department. At that time, there were visible injuries on her body.
 Ana Avila testified that on April 5, 2005, she saw a man and a woman swearing at each other and fighting in her front yard. The man pushed the woman, who fell against a tree. When she stood up, he hit her on the left side of her face. Avila then went to make a 911 phone call. When she returned, she saw the man and the woman walking away from each other.
 B. Defense Evidence
 Verdugo was also called as a defense witness. She testified that when she reported appellant's misconduct on April 9, 2005, she did not blame him for scratches that police officers noticed on her hands because she was not sure that he was responsible for them. In reporting his abusive conduct, she did not mention appellant's threats to harm her and to tell officers that there were drugs in her car. She first referred to these threats during a court hearing.
 West Covina Police Officer Major Whitlock testified that on April 5, 2005, he responded to a 911 call concerning a man and woman fighting in a front yard. He found appellant and Verdugo walking together, engaged in a verbal argument. When he contacted Verdugo, who was crying, he did not notice that she had any injuries. He did not arrest anyone.
 West Covina Police Officer Roosevelt Austin testified that he and Whitlock detained appellant and Verdugo on April 5, 2005. Verdugo told him only that she had sprained her ankle, and he did not notice that she had any other injuries, although she limped as she walked. When he offered to take her to a hospital, she said that she would be okay.
 DISCUSSION Appellant contends that (1) the trial court improperly denied his motions for self-representation underFaretta v. California (1975) 422 U.S. 806
[45 L.Ed.2d 562, 95 S.Ct. 2525] (Faretta), (2) the prosecutor engaged in misconduct, (3) the jury was misinstructed, and (4) there was sentencing error. *Page 726 
 A. Faretta
 Appellant contends that his requests for self-representation at a pretrial proceeding and at the preliminary hearing were improperly denied. We disagree.
 1. Governing Principles
 In Faretta, the United States Supreme Court held that a defendant in a criminal case "has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." (Faretta,supra, 422 U.S. at p. 807, italics omitted.) The defendant thus possesses two mutually exclusive constitutional rights under the Sixth Amendment of the United States Constitution regarding representation: the right to be represented by counsel at all critical stages of a criminal prosecution, and the right to represent himself or herself. (People v. Marshall
(1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262] (Marshall).) Unlike the former, the latter right is not self-executing. (Ibid.) "The right to counsel persists unless the defendant affirmatively waives that right"; moreover, "[c]ourts must indulge every reasonable inference against waiver of the right to counsel." (Ibid.)
 Generally, "[a] trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial. [Citations.]" (People v. Welch (1999)20 Cal.4th 701, 729 [85 Cal.Rptr.2d 203, 976 P.2d 754], overruled on another ground in People v. Blakeley (2000)23 Cal.4th 82, 89 [96 Cal.Rptr.2d 451, 999 P.2d 675].) The trial court may not deny the request on the basis of the defendant's inability to present a defense, provided that the defendant is competent to stand trial. (People v. Welch, at pp. 732-733.)
 2. Underlying Proceedings
 On June 22, 2005, approximately three weeks before the preliminary hearing, appellant appeared at a hearing before Commissioner Harold J. Mulville with his court-appointed public defender, Eric Stanford. Stanford explained that although a different public defender would probably handle appellant's case, he had discussed the case with appellant, and requested that *Page 727 a date be set for the preliminary hearing. The prosecutor then informed Commissioner Mulville that he had offered appellant a plea agreement that would limit his term of imprisonment to four years.
 In the course of the hearing, Stanford stated that appellant wished to address the court. Appellant complained that Stanford had declined to subpoena several witnesses to appear at the preliminary hearing, including employees of the hospital to which appellant took Verdugo on April 5, 2005. Commissioner Mulville responded that appellant should discuss the matter with the public defender ultimately assigned to handle his case. The following exchange then occurred:
 "[Appellant]: Sir, I want to go pro per.
 "[Commissioner Mulville]: You can't."
 There was no further discussion of appellant's request at the hearing, which terminated after a brief discussion of the plea agreement. When the prosecutor explained the agreement, appellant indicated that he would not accept it, and he again asked Commissioner Mulville whether subpoenas would be issued to the witnesses he had identified. Commissioner Mulville advised him to provide his public defender with the names of the witnesses, and the hearing ended.
 The preliminary hearing occurred before Superior Court Judge Michael A. Latin on July 12, 2005. Immediately prior to the hearing, appellant asserted a Marsden motion regarding his public defender, Dana Flaum.[2] During the hearing on the motion, appellant stated that he had decided to hire a private attorney to represent him because Flaum and his other public defenders had declined to subpoena the hospital employees and other individuals as witnesses. According to appellant, his private attorney was in trial, and could not represent him for two weeks. Appellant argued that the witnesses he wished to subpoena would establish that Verdugo had not been injured, and that the charge against him was "a lie"; he further asserted that he would be ready for the preliminary hearing with his private counsel in two weeks. Regarding Flaum, appellant stated: "I don't want him, sir. I want to fire him. . . ."
 Judge Latin denied the Marsden motion, reasoning that the decision not to subpoena the witnesses was a tactical decision within attorney Flaum's *Page 728 authority, and that appellant had otherwise not stated good cause to relieve Flaum. In so ruling, Judge Latin directed that the preliminary hearing would' go forward, and informed appellant that he was welcome "to try to bring [private counsel] on board after the preliminary hearing." Appellant became agitated and threatened to walk out of the courtroom, stating that he was "getting railroaded." in response to Judge Latin's assurance that "[y]ou do have the right, if you have the funds, to bring in your own lawyer," appellant stated "I have the money. No problem, Sir," but insisted he was "not going to sit here and get railroaded." Appellant again threatened to walk out of the courtroom, insisting "you're going to tackle me down, whatever you do. I'm going to get up and walk out." Following appellant's outbursts, the court took a brief recess, suggesting the bailiff might consider taking "some measures in lockup" before returning appellant to the courtroom.
 After the recess, the prosecutor and Flaum announced themselves ready to proceed with the preliminary hearing. The following dialogue occurred:
 "[Appellant]: Can I go pro per, sir? Your Honor, may I go pro per?
 "[Judge Latin]: No.
 "[Appellant]: Why? I have the right.
 "[Judge Latin]: The request is not timely. You can revisit that after the preliminary hearing, at your next appearance."
 Appellant did not renew his request to proceed in propria persona during the underlying proceedings, including his trial, at which he appeared before Judge Robert M. Martinez, represented by the private attorney he had identified during theMarsden hearing.
 3. Analysis
 The key issues before us are (1) whether appellant's remarks concerning self-representation were unequivocal invocations of his Faretta rights, and (2) whether appellant abandoned his request for self-representation after the preliminary hearing. As explained below, we conclude that appellant's remarks were not unequivocal (see pt. 3.a.,post); in addition, we conclude that even if appellant requested self-representation, he waived this request through abandonment after the preliminary hearing, and that any erroneous denial of self-representation at the preliminary hearing was harmless under People v. Pompa-Ortiz (1980)27 Cal.3d 519, 529 [165 Cal.Rptr. 851,612 P.2d 941] *Page 729 (Pompa-Ortiz) and Coleman v.Alabama (1970) 399 U.S. 1, 11 [26 L.Ed.2d 387,90 S.Ct. 1999] (Coleman) (see pt. 3.b.,post).
 a. Equivocal Remarks
 We begin by assessing whether appellant made an unequivocal Faretta request. On this matter, courts must determine "whether the defendant truly desires to represent himself or herself." (Marshall, supra,15 Cal.4th at p. 23.) Thus, "an insincere request or one made under the cloud of emotion may be denied." (Id. at p. 21.) In assessing appellant's remarks, we are not bound by Commissioner Mulville's and Judge Latin's responses, and their failure to make express findings on this matter does not oblige us to conclude that appellant's Faretta rights were infringed. (Id. at pp. 24-25.)
 As our Supreme Court explained inMarshall, in addressing this issue, "the court's duty goes beyond determining that some of [the] defendant's words amount to a motion for self-representation. The court should evaluate all of a defendant's words and conduct to decide whether he or she truly wishes to give up the right to counsel and represent himself or herself and unequivocally has made that clear." (Marshall, supra,15 Cal.4th at pp. 25-26.) Applying these principles, courts have concluded that under some circumstances, remarks facially resembling requests for self-representation were equivocal, insincere, or the transitory product of emotion.
 In Marshall, the defendant represented himself during some pretrial proceedings, and then requested and received a court-appointed attorney. (Marshall, supra,15 Cal.4th at pp. 15-19.) When the attorney asked the defendant for body tissue samples, the defendant told the trial court that he wanted to "`take the pro per status.'" (Id. at p. 18.) The trial court construed this remark as aFaretta request and denied it. (Id. at p. 19.) The court in Marshall concluded that the remark was an insincere ploy to disrupt the proceedings, pointing to the defendant's self-acknowledged inability to defend himself and his emotional response to his attorney's attempt to obtain the samples. (Id. at pp. 25-26.)
 Again, in People v. Scott (2001)91 Cal.App.4th 1197, 1204 [111 Cal.Rptr.2d 318], the defendant asserted a Marsden motion before trial. After the trial court denied the motion, the defendant stated, "`If that's the case, I hereby move the court to let me go pro se.'" (Id. at pp. 1204-1205 fn. 3.) When the trial court asked, "`For the record . . . are you sure you want to represent yourself?,'" the defendant replied: "`Yes. I do, judge. I don't want [appointed defense counsel] to represent me.'" (Id. at p. 1205.) He also said, "`[I]f I can't get a [new] state appointed attorney, then I['ll] represent myself,'" and "`For the record, I don't want this attorney representing me. *Page 730 You the court is [sic] coercing me.'" (Ibid.) The court in Scott concluded that these remarks, viewed in context, were too equivocal to constitute a Faretta request, and that the defendant made them out of frustration at the denial of hisMarsden motion. (Id. at pp. 1205-1206; see also People v. Danks (2004) 32 Cal.4th 269, 295-297
[8 Cal.Rptr.3d 767, 82 P.3d 1249] [defendant's remark, "`I want to defend myself and go pro. per if I'm not allowed to go pro. per., I would at least like to be cocounsel . . .,'" (italics omitted) viewed in context, was not a sincere Faretta
request].)
 Relevant to our inquiry is whether appellant reasserted a request for self-representation when presented with the opportunity to do so. In People v. Valdez (2004)32 Cal.4th 73, 91-92 [8 Cal.Rptr.3d 271, 82 P.3d 296] (Valdez), the defendant asserted a Marsden
motion, which the trial court denied. The defendant then stated: "`Well, in this matter I am — my constitutional rights if I want to go pro. per. on this case I could do that.'" (Id. at p. 98.) The trial court responded to this as aFaretta request and denied it. (Ibid.) The defendant did not refer to self-representation at his next court appearance, which was conducted by a different bench officer. (Id. at p. 100.) After several hearings, he made aFaretta request to this bench officer, which was denied as untimely. (Ibid.) The court in Valdez
concluded that the defendant had not asserted an unequivocalFaretta request, reasoning, inter alia, that he made only a single reference to self-representation, and failed to press for self-representation at his next court appearance before the new bench officer. (Id. at pp. 99-101; see also Jackson v. Ylst (9th Cir. 1990) 921 F.2d 882,887-888 [defendant's failure to renew his request for self-representation indicates that it was equivocal].)
 In our view, appellant's remarks were impulsive reactions to his frustrated attempts to secure an attorney who would subpoena the witnesses that he desired, rather than unequivocal Faretta requests. His statements and conduct establish that his goal was a defense based on these witnesses but presented by counsel, rather than by himself. Before Commissioner Mulville, appellant complained about his public defender's failure to obtain the presence of the witnesses, and asked whether he could have subpoenas issued to the witnesses — presumably, so that his public defender could present their testimony. Only after Commissioner Mulville told him to consult his public defender did appellant refer to self-representation, which Commissioner Mulville denied. Although appellant otherwise spoke vigorously in court, he immediately returned to the topic of the witnesses, and did not pursue self-representation. As in Valdez, appellant made a single remark about self-representation, apparently born of frustration at his public defender's decisions.
 That appellant sought an attorney amenable to his defense strategy, rather than self-representation, is corroborated by his subsequent behavior. Much *Page 731 like the defendant in Valdez, he did not immediately avail himself of the opportunity presented by a new bench officer to press for self-representation. Instead, he engaged a private attorney, and at the inception of the preliminary hearing, raised a Marsden motion before Judge Latin, seeking to continue the preliminary hearing so that his private attorney could present the witnesses he desired. Appellant's conduct strongly suggests that his remark about self-representation to Commissioner Mulville stemmed from a desire to be represented by counsel willing to secure these witnesses, rather than from a desire to represent himself.
 We conclude that appellant's remarks about self-representation before Judge Latin arose from the same desire. Only after Judge Latin denied the Marsden
motion and a continuance to facilitate representation by his private attorney did appellant refer to self-representation, immediately following his emotional response to these rulings. Thereafter, despite Judge Latin's express invitation, appellant declined to revisit the question of self-representation, even though his trial was conducted before a different bench officer. Instead, he appeared at all proceedings with his private attorney, who at no time suggested he was appearing because appellant's request for self-representation had been denied. As in Marshall, Scott, and Valdez, appellant's remarks to Judge Latin appear to have stemmed solely from his frustrated desire for representation by private counsel; moreover, as in Marshall, his remarks appear to be an attempt to obtain a fresh opportunity to request a continuance, and thereby delay the proceedings.
 b. Waiver
 Even if appellant made an unequivocalFaretta request that may have been wrongfully denied, the record establishes that appellant waived his right to self-representation. As we explain below, (1) he abandoned his request after the preliminary hearing, and (2) any error at the preliminary hearing was harmless.
 i. Abandonment
 Numerous courts have held that after a defendant invokes the right to self-representation, a waiver may be found if it reasonably appears that the defendant abandoned the request. (E.g., People v. Dunkle (2005)36 Cal.4th 861, 907-908 [32 Cal.Rptr.3d 23, 116 P.3d 494]; People v.Kenner (1990) 223 Cal.App.3d 56, 60-62 [272 Cal.Rptr. 551];Brown v. Wainwright (5th Cir. 1982)665 F.2d 607, 611.) Instructive applications of this principle are found in People v. Stanley (2006) 39 Cal.4th 913
[47 Cal.Rptr.3d 420, 140 P.3d 736] (Stanley), andWilson v. Walker (2d. Cir. 2000) 204 F.3d 33
(Wilson).
 In Stanley, the defendant raised the issue of self-representation during a Marsden hearing, which occurred before the preliminary hearing. (Stanley, *Page 732 supra, 39 Cal.4th at p. 929.) The trial court declined to permit the defendant to represent himself, and denied the Marsden motion. (Id. at pp. 930-931.) Thereafter, the defendant accepted representation by several court-appointed attorneys without requesting self-representation. (Id. at p. 933.) The court inStanley concluded not only that the defendant had not knowingly and intelligently waived his right to counsel, but that his subsequent conduct established that he had abandoned his desire to invoke his Faretta rights. (Id.
at p. 933.)
 Again, in Wilson, the defendant tried to replace his court-appointed attorney before trial, and repeatedly asserted that he wanted to represent himself. (Wilson, supra, 204 F.3d at p. 35.) The trial court denied the motion for new counsel and application for self-representation. (Id. at pp. 35-36.) The defendant later received a second attorney, who stated upon appointment that the defendant wished to represent himself. (Id. at p. 36.) In response, the trial permitted the second attorney one week to review the defendant's request to proceed in propria persona. (Ibid.) The second attorney apparently did not revisit the request, and when the trial court later appointed a third attorney, the defendant voiced no objection and never renewed his request for self-representation. (Ibid.) The court held that the defendant had waived his right to self-representation, pointing to the trial court's remark to the second attorney indicating that it had not foreclosed self-representation, and to the defendant's persistent failure to renew the request, despite his willingness to assert his perceived rights in court. (Id. at pp. 38-39.)
 On the record before us, we conclude that following the preliminary hearing, appellant abandoned any desire for self-representation expressed to Commissioner Mulville and Judge Latin. He never accepted Judge Latin's invitation to renew his request following the preliminary hearing, notwithstanding his demonstrated proclivity to speak for himself and opportunity to do so before a new bench officer. Instead, he proceeded as he had said he wished to do at the preliminary hearing, viz., with retained counsel of his choice.
 Appellant contends that the rulings by Commissioner Mulville and Judge Latin rendered further invocations of his right to self-representation futile. His reliance on U.S. v. Arlt (9th Cir. 1994)41 F.3d 516 (Arlt), People v. Dent (2003)30 Cal.4th 213 [132 Cal.Rptr.2d 527, 65 P.3d 1286], U.S. v.Hernandez (9th Cir. 2000) 203 F.3d 614
(Hernandez), and Williams v. Bartlett (2d Cir. 1994) 44 F.3d 95 (Williams) is misplaced, as these cases are factually distinguishable.
 In Arlt, the defendant made a request before trial to proceed in propria persona. (Arlt,supra, 41 F.3d at pp. 517-518.) After a hearing, the trial court *Page 733 denied the request on the ground that the defendant could not present an adequate defense. (Ibid.) The defendant subsequently hired private counsel and did not renew his request. (Ibid.) The Ninth Circuit held that this conduct did not constitute an abandonment of the request, reasoning that the trial court's denial precluded self-representation, and forced the defendant to pursue his remaining alternatives. (Id. at p. 522.)
 Here, unlike the defendant in Arlt, appellant cannot reasonably have regarded Commissioner Mulville's response to his remarks as conclusively foreclosing the option of self-representation. As the court indicated inValdez, the preliminary hearing was conducted by a different bench officer, and thus provided appellant with a fresh opportunity to make a Faretta request. (Valdez, supra, 32 Cal.4th at pp. 99-101.) Nor did Judge Latin's response to his remarks eliminate the option of self-representation; on the contrary, Judge Latin expressly invited appellant to revisit the issue at his next appearance.
 In Dent, the defendant, who was facing a potential death sentence, was represented by attorneys who were repeatedly late for proceedings. (People v. Dent,supra, 30 Cal.4th at p. 216.) When they were not present at the beginning of the defendant's trial, the court told the defendant that new counsel would be appointed for him because he could not represent himself. (Ibid.) Concerned that the defendant might make incriminating remarks, the trial court prevented him from speaking except through counsel. (Ibid.) Shortly thereafter, the attorneys appeared and conferred with the defendant. (Ibid.) They informed the trial court that the defendant wished to proceed with one of his former attorneys or to represent himself. (Id. at p. 217.) The trial court peremptorily denied the request for self-representation, stating, "`Not in a death penalty murder trial,'" and ordered both attorneys relieved. (Ibid.) The defendant never renewed his Faretta request. (Ibid.)
 The court in Dent concluded that the trial court had denied the Faretta request for an improper reason, and that the record did not otherwise support the denial. It rejected the contention that the defendant's failure to renew the request was evidence of equivocation, noting the trial court's instruction not to speak except through counsel, coupled with its firm denial of the Faretta
request, "may well have convinced defendant the self-representation option was simply unavailable, and making the request again would be futile." (People v. Dent,supra, 30 Cal.4th at p. 219.) As we have explained, that is not the case here.
 In Hernandez, the defendant asserted a request for self-representation at a pretrial status conference. (Hernandez, supra, 203 F.3d at p. 617.) Following a hearing, the district court denied the request on the ground that the defendant did not understand the legal issues and was incapable of defending *Page 734 himself. (Id. at p. 618.) in so ruling, the district court stated that it would reconsider the request if the defendant persisted in it. (Id. at pp. 623-624.) The Ninth Circuit held that the defendant's failure to renew his motion did not establish that his request was equivocal. (Id. at pp. 623-624.) It reasoned that the district court's ground for denying the request was unlikely to change, and thus the defendant reasonably viewed the option of self-representation as foreclosed, notwithstanding the district court's remark that he could renew his motion. UnlikeHernandez, Judge Latin's announced ground for denying self-representation at the time of the preliminary hearing — untimeliness — was not a settled or fixed condition permanently foreclosing the option of appellant's self-representation. Moreover, unlike Hernandez, appellant appeared before a different bench officer for trial.
 Finally, in Williams, the defendant repeatedly asked to represent himself during the pretrial proceedings. (Williams, supra, 44 F.3d at pp. 97-98.) The trial court eventually denied the request on the ground that the defendant lacked legal training, and the defendant thereafter failed to renew his request. (Ibid.) The court in Williams concluded that the pretrial request was wrongfully denied and rejected the contention that the defendant had waived his right to self-representation, reasoning that the pretrial request was denied on grounds that the defendant could not cure before trial. (Id. at p. 101.) As we have indicated, no such grounds were given here. In short, appellant's conduct following the preliminary hearing demonstrates that by the time of trial, and likely well before, appellant had abandoned any desire he may have harbored to represent himself, in favor of proceeding to trial with retained counsel of his choice.
 ii. Harmless Error
 In any event, we conclude that any error in the rejection of appellant's Faretta request at the preliminary hearing stage is harmless in this case. Although most errors in criminal proceedings are subject to harmless error analysis, the United States Supreme Court has identified a small number of "structural" errors at trial — i.e., "structural defect[s] affecting the framework within which the trial proceeds" — that are reversible per se. (Arizona v. Fulminante (1991) 499 U.S. 279, 310
[113 L.Ed.2d 302, 111 S.Ct. 1246]; see People v. Stewart
(2004) 33 Cal.4th 425, 462 [15 Cal.Rptr.3d 656, 93 P.3d 271].) These structural errors "include: (i) `total deprivation of the right to counsel at trial'; (ii) trial by a `judge who was not impartial'; (iii) `unlawful exclusion of members of the defendant's race from the grand jury'; (iv) denial of the right to self-representation at trial; and (v) denial of the right to a public trial." (People v. Stewart, supra,33 Cal.4th at p. 462, quoting Arizona v. Fulminante, supra,499 U.S. at pp. 309-310.) However, an error that would constitute a structural defect at trial is not invariably *Page 735 reversible per se when confined to the preliminary hearing. Thus, in Coleman, the United States Supreme Court held that an improper denial of counsel confined to the preliminary hearing is subject to harmless error analysis. (Coleman, supra,399 U.S. at p. 11.)
 The question presented here is whether a defendant who is denied the right of self-representation at the preliminary hearing, but who subsequently waives this right and is represented at trial by counsel of his choice, must, on appeal, establish prejudice from the denial. InPompa-Ortiz, supra, 27 Cal.3d at p. 529, our Supreme Court held that irregularities at the preliminary hearing are reviewed on appeal under "the appropriate standard of prejudicial error and . . . require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice [is] limited to pretrial challenges of irregularities." (Pompa-Ortiz, supra,27 Cal.3d at p. 529.) In so holding, the court expressly noted the holding inColeman, and remarked that "even . . . a situation as extreme as the denial of counsel" at the preliminary hearing is subject to harmless error analysis. (Id. at pp. 529-530.)
 The focus of our inquiry, therefore, is whether harmless error analysis is also appropriate for an improper denial of self-representation at the preliminary hearing. As the United States Supreme Court explained in Faretta, theSixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it, "and thus accords the defendant a set of rights "necessary to a full defense." (Faretta, supra, 422 U.S. at p. 818.) These rights differ in their underlying rationale. (Id. at pp. 819-821, 832-835.) The right to self-representation honors the defendant's capacities for choice and responsibility, whereas the right to counsel rests on the recognition that most defendants are incapable of mounting an effective defense by themselves. (Id. at pp. 832-835.) Nonetheless, both rights are tethered to the controlling principle of theSixth Amendment: "The right to defend is given directly to the accused; for it is he who suffers the consequences. . . ." (422 U.S. at pp. 819-820.) Accordingly, each right is granted personally to the defendant and is subject to the defendant's choice and control. (Id. at pp. 819-821, 832-835.)
 The differences between the rationales for the rights support divergent accounts as to why their erroneous denial at trial constitutes a structural defect in the trial. Addressing the right of self-representation at trial, the United States Supreme Court has explained: "Since the right of self-presentation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to `harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." (McKaskle v. Wiggins
(1984) 465 U.S. 168, 177, *Page 736 fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944].) in contrast, regarding the denial of counsel at trial, the court has indicated that the advantages of representation by counsel over self-representation support a presumption of prejudice. (Flanagan v. United States (1984)465 U.S. 259, 268 [79 L.Ed.2d 288, 104 S.Ct. 1051]; see Gideon v.Wainwright (1963) 372 U.S. 335, 344-345 [9 L.Ed.2d 799,83 S.Ct. 792] [representation by counsel is necessary to ensure a fair trial in view of defendants' general inability to prepare adequate defense].)
 Despite these differences, we conclude that the denial of self-representation at the preliminary hearing, like the denial of counsel at the preliminary hearing, is subject to harmless error analysis. As we explain below, to hold otherwise leads to a result difficult to reconcile with the right to a full defense guaranteed all defendants by the Sixth Amendment: a defendant wrongfully denied the advantages of counsel at the preliminary hearing would be obliged to carry a heavier burden on appeal than a defendant who wrongfullyreceived these advantages. Unless both errors are subject to harmless error analysis, the defendant who seeks and is denied counsel at the preliminary hearing must show prejudice from this error, whereas a defendant who benefits from counsel at the preliminary hearing after an improper denial of self-representation — and who subsequently requests and receives counsel at trial — would be entitled to per se reversal of the judgment.
 The import of Coleman is to remove the presumption of prejudice when the denial of counsel is confined to the preliminary hearing. In Coleman, the plurality opinion and the principal concurring opinion agreed that a defendant who is denied counsel at the preliminary hearing loses the advantages of counsel in that forum. (Coleman,supra, 399 U.S. at pp. 1-10 (plur. opn. of Brennan, J.), 11-12 (cone. opn. of Black, J.).) Nonetheless, a majority of the court held the defendant must show that this error affected the outcome of the trial under the standard of prejudice defined in Chapman v. California (1967) 386 U.S. 18,24 [17 L.Ed.2d 705, 87 S.Ct. 824] (Chapman). (Coleman, supra, 399 U.S. at p. 11.) Accordingly, unless a defendant improperly denied self-representation at the preliminary hearing is held to the same requirement, the defendant will be entitled to an automatic reversal of the judgment, even though the error will typically work in his or her favor at trial. Neither the Constitution nor case law compels such an anomalous result.
 We therefore conclude that the right of self-representation confined to the preliminary hearing is subject to harmless error analysis pursuant to Chapman.
As the United States Supreme Court has indicated,Chapman analysis is appropriate when, as here, the defendant undergoes a trial represented by counsel of his choice. (Rose v. Clark (1986) 478 U.S. 570, 578
[92 L.Ed.2d 460, *Page 737 106 S.Ct. 3101], overruled on other grounds inBrecht v. Abrahamson (1993) 507 U.S. 619, 637
[123 L.Ed.2d 353, 113 S.Ct. 1710] and Yates v. Evatt
(1991) 500 U.S. 391, 403, fn. 8 [114 L.Ed.2d 432,111 S.Ct. 1884] ["Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."].) Our conclusion finds additional support in People v. Dunkle,supra, 36 Cal.4th 861, in which our Supreme Court held that a defendant who was wrongly denied the right to self-representation for a year during pretrial proceedings, but who subsequently expressly waived this right and proceeded to trial with counsel, was not entitled to relief on appeal, reasoning that the defendant's waiver had "cured the error." (Id. at pp. 907-910.)
 We recognize that in Moon v. SuperiorCourt (2005) 134 Cal.App.4th 1521, 1531-1534
[36 Cal.Rptr.3d 854], the court held that a defendant who was wrongfully denied the right to represent himself at the preliminary hearing, and who subsequently sought relief by writ, was not required to show prejudice from the denial. We do not disagree with Moon, but conclude that its holding is inapplicable to the situation before us. As the court explained in Pompa-Ortiz, a defendant who raises a "pretrial challenge? of irregularities" in the preliminary hearing may properly be relieved of the burden of showing prejudice. (Pompa-Ortiz, supra, 27 Cal.3d at p. 529.) No such challenge was presented here. Rather than seeking relief by writ following the preliminary hearing, appellant waived his right to self-representation and elected to proceed at trial with counsel of his choice.
 On the record before us, we see no prejudice under Chapman. Following the preliminary hearing, appellant appeared with retained counsel of his choice, who represented appellant throughout trial. Appellant has not attempted to demonstrate that his defense at trial was in any way impaired by his failure to represent himself at the preliminary hearing. It thus appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (Chapman, supra, 386 U.S. at p. 24.) Accordingly, appellant is not entitled to relief on appeal due to the denial of his Faretta requests prior to the preliminary hearing.
 B.-E.*
B. Prosecutor's ClosingArgument
 Appellant contends that the prosecutor made remarks during closing argument that constitute misconduct. In the alternative, he contends that his counsel rendered ineffective assistance by refraining from objecting to these remarks. As we explain below, both contentions fail.
1. Prosecutor's Remarks
 At the outset of the opening portion of closing argument, the prosecutor acknowledged that Verdugo's injuries were not serious, and remarked: "It's a bruise. . . . It's not huge. It doesn't have to be great bodily injury or even pretty darn bad. . . . He hit her and he left a mark. You say, that's not that big of a deal. Everybody inCalifornia that's charged with a criminal offense has aright to a jury trial.
 One marijuana cigarette or multiple murder, the burden of proof is the same, the process is the same. One marijuana cigarette to multiple murder it all goes through this process. [¶] Is this the biggest crime? Probably not. But for the people involved, it's very important. So at the beginning I asked you to pay close attention to all of the witnesses no matter who called them. . . ." (Italics added.)
 After summarizing Verdugo's testimony, the prosecutor stated "And she can't remember all the details. And does that mean that she's lying about it or does that mean that for her she's doing the best that she can to tell you what she remembers?" The prosecutor continued: "You're notsupposed to use sympathy or prejudice to make yourdecision, but you can use empathy. You can try andimagine how the participants felt given theircircumstances. [¶] Who's Sonia Verdugo? What do you know about her? She had a drug issue. She went through the courts. She cleared it up. She finished the program. She has two children with this man. She's trying to get her life back on track. [¶] He's calling her all these names. He's treating her like dirt. He punched her. [¶] If you can say, youknow what? When Sonia Verdugo testified, she wasn'tscripted like they are in the movies or on TV, andthere's things I wish she could have told me, but Ibelieve her. I believe that she was scared. And Ibelieve [appellant] hit her. And I believe she wentdown the street. If you believe her, that'senough." (Italics added.)
 After describing Avila's testimony, the prosecutor compared Verdugo's emotional state at the time of the underlying events with that of Avila: "[Verdugo is] one of the perceivers and the other perceiver is in her house having a lovely evening. Of course, what these two people describe is going to be different, the emotional strain that [Verdugo is] under is completely different than the condition of Ana Avila. There's no way that what they describe could be exactly the same."
 The prosecutor then described the testimony of officers Whitlock and Austin, who responded to Avila's 911 call. In describing their training regarding domestic violence, she stated that her own professional experience in talking about "foul and disgusting things" had made her immune to their emotional impact, and opined that this was probably also true of defense counsel.
 At this point, the prosecutor argued: "Youare now asking Sonia Verdugo, not a lawyer, to come up here andin a room full of strangers tell you that she has made such badchoices in her life; to admit that she had a drug problem, thatshe got it cleaned up; to admit that she has two children outof wedlock with [appellant], a man who calls her names and degradesand disrespects her and hits her; to tell you that she stillloves this man who did this to her; to admit, basically, thatshe has so little respect for herself that she would stay withhim, in a room full of strangers out and out admit that to youbecause that's what she had to do." (Italics added.) The prosecutor then argued that appellant's presence made it difficult for Verdugo to report the attack to officers Whitlock and Austin, and to the nurse at the hospital that Verdugo visited on April 5, 2005.
 After noting that defense counsel had repeatedly asked Verdugo to explain her conduct, the prosecutor stated, "We are not robots . . . And we don't act rationally." The prosecutor elaborated on this point, asserting that "love is the most irrational thing that you can ever do." She then argued: "And now we ask [Verdugo] to come into court and explainthis all to you. And if Sonia Verdugo had been a customer at aTaco Bell and she had been robbed, nobody would have grilled heron why did you go to Taco Bell that day? Why did you order theSuper Value meal? Why did you order diet Pepsi insteadof regular Pepsi? But because the person who hurt her is a personshe loves[, w]e treat her that way. And she gets grilled againand again and again. And something that probably took 10 to 15minutes she has to talk about for a couple of hours." (Italics added.)
 After observing that Verdugo did not have the benefit of the reports she gave to police and the transcripts of her prior testimony, the prosecutor argued: "She's just a person doing the best that she can." The prosecutor urged the jury to consult the factors that they had been instructed were relevant to a witness's credibility, and to interpret the evidence, rather than any insinuations raised in cross-examination: "So if there was a question insinuating that she did this for revenge purposes and there were things thrown into that question but she did not give you the answer on the stand, . . . then you don't get to bring it in, it's what she said." The prosecutor then argued: "And if I were scripting somebody, it would beperfect. But we don't script. We take real people who arevictims of real crimes. We put them on the stand where they aregrilled and accused." (Italics added.) Shortly thereafter, the prosecutor concluded her argument.
2. Prosecutorial Misconduct
 Appellant contends that the italicized portions of the prosecutor's argument constitute misconduct. He argues that: (1) the prosecutor's remark that the trial was not "that big of a deal," but that "[e]verybody in California that's charged with a criminal offense has a right to a jury trial," invited the jury to blame appellant for any annoyance they felt about the trial; (2) her statement that the jury could extend empathy to Verdugo and her descriptions of Verdugo's hardships in testifying were an improper demand for sympathy for Verdugo; (3) her references to Verdugo's "grilling" at trial amounted to an attack on appellant's attorney and improper comment on appellant's failure to testify; and (4) her expressions of belief in Verdugo's credibility and denials that Verdugo had been scripted constituted impermissible vouching.
 No objection was raised to the prosecutor's remarks during trial, and thus appellant has forfeited his contentions. Absent an objection and request for an admonition to the jury, we review a contention of prosecutorial misconduct "`only if an admonition would not have cured the harm cause by the misconduct.'" (People v. Earp (1999)20 Cal.4th 826, 858.) Appellant does not contend that this exception is applicable here. We have nonetheless examined appellant's contentions of error, and conclude that with the exception of two comments, the prosecutor did not stray into error. As we explain below, these comments were harmless.
 Regarding item (1), the prosecutor's remark occurred as she explained that every criminal defendant is entitled to a jury trial, and urged the jury to take the decisions presented to them seriously. Generally, "[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (People v. Frye (1998)18 Cal.4th 894, 970.)
 Under this standard, the remark, viewed in context, was not improper. (See People v. Bradford
(1997) 15 Cal.4th 1229, 1380 [prosecutor's remark during penalty phase of trial that "`justice demands an execution'" does not attack defendant's right to a fair trial].)
 Regarding item (2), "an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt." (People v. Stansbury (1993) 4 Cal.4th 1017, 1057.) Nonetheless, the prosecutor may properly argue that the alleged victim's hardships in recounting her version of the underlying events to strangers throughout the judicial process tends to bolster her credibility. (People v. Turner (1983)145 Cal.App.3d 658, 673, disapproved on other grounds in Peoplev. Majors (1998) 18 Cal.4th 385, 411, and People v.Newman (1999) 21 Cal.4th 413, 423, fn. 6; People v.Wiley (1976) 57 Cal.App.3d 149, 163, disapproved on other grounds in People v. Wheeler (1978) 22 Cal.3d 258,286-287, and People v. Hayes (1990) 52 Cal.3d 577, 628, fn. 10.)
 Here, the prosecutor warned the jurors not to base their decision on sympathy for Verdugo, and her argument, viewed in context, merely asked jurors to evaluate Verdugo's conduct — including her delay in reporting appellant's misconduct — in light of her background and circumstances. The prosecutor pointed to Verdugo's embarrassment at having to reveal facts about her background to the jurors and other strangers; in addition, she argued that the differences between Verdugo's and Avila's accounts stemmed from Verdugo's fear of appellant. In our view, this argument was not an improper appeal to sympathy.
 Regarding item (3), it is improper "for the prosecutor `to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. . . . Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom.'" (People v. Fierro
(1991) 1 Cal.4th 173, 212, quoting People v. Thompson
(1988) 45 Cal.3d 86, 112.) Nor may the prosecutor denigrate the defendant's right to be represented by counsel through attacks on defense counsel. (People v. Turner, supra,145 Cal.App.3d at p. 658.) Nonetheless, an improper comment occurs only when there is "a personal attack" on defense counsel. (People v. Taylor (2001) 26 Cal.4th 1155, 1166-1167.)
 No attack of this sort occurred here. The italicized remarks cited by appellant constitute elements of the prosecutor's attempt to enhance Verdugo's credibility by reference to her hardships in testifying. Viewed in context, the prosecutor's statement that Verdugo was "grilled" about embarrassing facts encompasses the prosecutor's own examination of Verdugo, which elicited these facts. Assuming the prosecutor's observation that "[w]e put [alleged victims] on the stand where they are grilled and accused" and that Verdugo was "grilled again and again and again" referred to questioning by both the prosecutor and defense counsel, these remarks remain too mild and diffuse to constitute a personal attack on defense counsel. (See People v. Medina (1995) 11 Cal.4th 694,759 ["To observe that an experienced defense counsel will attempt to "`twist'" and "`poke'" at the prosecution's case does not amount to a personal attack on counsel's integrity."].)
 Nor do the italicized remarks constitute improper comment on appellant's failure to testify. Regarding this contention, our Supreme Court explained in People v.Bradford, supra, 15 Cal.4th 1229, 1339: "In Griffin v.California (1965) 380 U.S. 609, the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. [Citations.] Nonetheless, . . . a prosecutor may commit Griffin error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided only by the defendant, who therefore would be required to take the witness stand. [Citations.]" (Italics deleted.) Here, the prosecutor made no such argument. In seeking to enhance Verdugo's credibility, she never suggested that appellant could have presented his own account of the underlying events, but failed to do so.
 Finally, regarding item (4), "[i]mpermissible `vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony. [Citations.]" (People v. Fierro, supra,1 Cal. 4th at p. 211.) As our Supreme Court explained in People v.Heishman (1988) 45 Cal.3d 147, 195: "Although a prosecutor may state his opinion formed from deductions made from evidence introduced at the trial, he or she may not express a personal opinion as to guilt if there is a substantial danger that a juror will interpret it as being based on information not in evidence. Further, the prosecutor is prohibited from stating or implying facts for which there is no evidence before the jury. [Citations.]"
 In view of these principles, the prosecutor strayed into error in remarking that she believed Verdugo's testimony, which she affirmed was not "scripted," and later asserting, "But we don't script. We take real people who are victims of real crimes." However, we do not discern prejudice from these remarks. Because the misconduct consists of two short and thematically related comments, it did not affront the guarantee of due process in the United States Constitution. (People v. Espinoza (1992) 3 Cal.4th 806, 820-821.) The prosecutor's remarks were thus reversible error only if it is reasonably probable that they influenced the jury. (Peoplev. Medina, supra, 11 Cal.4th at pp. 756-758.)
 The remarks were brief, and the jury was subsequently instructed that the prosecutor's statements are not evidence. (CALJIC No. 1.02.) Moreover, Avila's testimony and other evidence corroborated Verdugo's testimony about appellant's misconduct (see pt. C., post), and thus there was compelling evidence that appellant had engaged in the crime with which he had been charged. Accordingly, a more favorable outcome for appellant was not reasonably likely in the absence of the comments. In sum, there was no reversible prosecutorial misconduct.
 3. Ineffective Assistance of Counsel
 Appellant also contends that his counsel rendered ineffective assistance by failing to object to the prosecutor's argument.[3] He is mistaken. As we have explained (see pt. B.2, ante), much of this argument was proper, and therefore defense counsel did not err in declining to raise meritless objections to it. (People v. Price (1991)1 Cal.4th 324, 387.) To the extent that the prosecutor engaged in any impermissible vouching, defense counsel may have made the reasonable tactical decision not to challenge it because it underscored the questions about Verdugo's credibility that defense counsel developed at length in his closing argument. (People v. Shoals (1992) 8 Cal.App.4th 475, 501
[ineffective assistance occurs only when counsel's acts cannot be explained on the basis of any knowledgeable choice of tactics].) Moreover, for the reasons described above (see pt.B.2., ante), the failure to object to these remarks was not prejudicial.
C. CALJIC 2.27
 Appellant contends that the trial court erred in failing to instruct the jury with CALJIC No. 2.27, which states: "You should give the testimony of a single witness whatever weight you think it deserves. Testimony by one witness, which you believe concerning any fact, is sufficient for proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends."[4]
 This instruction traces its origins to Peoplev. Rincon-Pineda (1975) 14 Cal.3d 864, in which our Supreme Court stated that it should be given "in every criminal case in which no corroborating evidence is required." (Id. at pp. 884-885.) We are unaware of any authority requiring the corroboration of the alleged victim's testimony regarding the offense of corporal injury to a co-parent (§ 273.5, subd. (a)), and thus conclude under Rincon-Pineda that the failure to give CALJIC No. 2.27 was error. (See Use Note to CALJIC No. 2.27, supra, p. 60.)
 Because this error is one of state law, it is prejudicial only if there is a reasonable probability that the jury would have reached a result more favorable to appellant had the instruction been given. (People v. Carpenter (1997)15 Cal.4th 312, 393.) At least two courts have concluded that the failure to give CALJIC No. 2.27 is not reversible error when a witness's testimony is corroborated on material points by other witnesses and evidence. (People v. Alvarado
(1982) 133 Cal.App.3d 1003, 1023 [witness's testimony regarding existence of attempted robbery is corroborated by other testimony sufficient to establish the elements of the crime];People v. Haslouer (1978) 79 Cal.App.3d 818, 833
[statements by victims of sexual abuse are corroborated by other evidence].)
 We conclude that the error here was not prejudicial. To establish the offense alleged against appellant under section 273.5, subdivision (a), the prosecutor was obliged to show that appellant engaged in a battery involving a direct application of force on Verdugo that resulted in corporal injury. (People v. Jackson (2000) 77 Cal.App.4th 574,580.) For the purpose of this offense, bruising constitutes a corporal injury. (People v. Beasley (2003)105 Cal.App.4th 1078, 1085-1089.) In addition, the prosecutor was required to show that Verdugo was the mother of appellant's children (§ 273.5, subd. (a)).
 To the extent that Verdugo testified about the requisite battery and injury, her testimony was corroborated by other evidence. On these matters, Avila testified that she made a 911 call after she saw a man and woman struggling in front of her house, and saw the man hit the woman; Whitlock and Austin testified that they discovered appellant and Verdugo when they responded to the 911 call; and photographs depicting the bruises on Verdugo's face and shoulder when she reported appellant's attack were admitted into evidence. Although no evidence corroborates Verdugo's testimony that she was the mother of appellant's children, that fact was never disputed. Moreover, the jury received other instructions regarding witness credibility, including CALJIC Nos. 2.13, [5] 2.21.1, [6] and 2.21.2, [7] which provide guidance as to the assessment of testimony from a single witness who may have made inconsistent or false statements. In addition, the jury received CALJIC No. 2.22, which instructed them that "the convincing force of the evidence," rather than the "relative number of witnesses" on an issue, is "[t]he final test" in assessing testimony.[8]
Because Verdugo's testimony was corroborated on key matters and the jury otherwise received sufficient instruction on witness credibility, the error here was harmless. (See People v.Snead (1993) 20 Cal.App.4th 1088, 1097 [failure to give instruction is harmless when the other instructions provided to jury give adequate guidance].)
 D. Sentencing
 Appellant contends that in imposing the upper term on his conviction for corporal injury to a co-parent, the trial court (1) made improper "dual use" of facts otherwise employed to enhance his sentence, and (2) contravened his right to a jury trial under Blakely v. Washington (2004)542 U.S. 296 (Blakely) and Cunningham v.California (2007) 549 U.S. ___ [127 S.Ct. 856] (Cunningham). For the reasons explained below, we conclude that the trial court erred in selecting the upper term.
 1. Underlying Proceedings
 Following a bench trial, the trial court determined that in December 2001, appellant had suffered a misdemeanor conviction for corporal injury to a co-parent (§ 273.5, subd. (a)); in addition, it found that he had convictions for robbery (§ 211) and receiving stolen goods (§ 496, subd. (a)), as well as a conviction for making terrorist threats (§ 422), which constituted a "strike" under the "Three Strikes" law.[9] In view of appellant's prior conviction for corporal injury to a co-parent, the middle and upper terms for appellant's current offense were, respectively, four and five years. (§ 273.5, (e)(1).) The trial court selected the upper term, doubled this term due to the prior strike (§ 667, subd. (e)(1)), and imposed two one-year enhancements under section 667.5, subdivision (b), for the prison terms that appellant had served in connection with the other felony convictions, resulting in a total term of 12 years.
 The trial court denied probation on the grounds that appellant was on probation of the time of the offense, had suffered prior prison terms, and posed a substantial danger to others. In selecting the upper term, the trial court found no mitigating factors. Regarding aggravating factors, it said to appellant: "[T]he court has taken into consideration that you have served prior terms, that you pose a substantial danger to others." Appellant contends that the first factor involves improper "dual use" of the prison terms underlying the one-year enhancements, and the second factor is impermissible underBlakely and Cunningham.
 2. Forfeiture
 At the outset, respondent argues that appellant has forfeited his contentions by failing to raise them before the trial court. We disagree. Generally, the absence of a timely objection works a forfeiture when the trial court erred in its discretionary sentencing choices, include instances in which "it double-counted a particular sentencing factor, misweighed the various factors, or failed to . . . give a sufficient number of valid reasons." (People v. Scott (1994) 9 Cal.4th 331,353 (Scott).) The rationale for this rule is "to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellant claims." (Id. at p. 351.)
 In view of this rationale, the rule is applicable only when there is a meaningful opportunity to objectbefore sentence is imposed, that is, at some point in the sentencing hearing, where "the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing." (People v. Gonzalez
(2003) 31 Cal.4th 745, 751-752.) Moreover, the forfeiture rule is generally inapplicable when "an objection would have been futile or wholly unsupported by substantive law then in existence." (People v. Welch (1993) 5 Cal.4th 228, 237.)
 Here, appellant had no meaningful opportunity to interpose an objection to the improper "dual use" of his prior prison terms. Appellant's sentencing memorandum asked the trial court to select the lower term for his offense. At the sentencing hearing, the trial court heard argument from the prosecutor, who asked the court to choose the upper term and impose a total sentence of 12 years in accordance with the calculation described above. The prosecutor pointed to a number of facts that might support the selection of the upper term, including that appellant had "numerous prior convictions," displayed a pattern of violent conduct, "ha[d] been to prison before," and was on probation at the time of the offense. The trial court heard responses from appellant and his counsel before imposing sentence, but never indicated that it would rely on multiple terms of imprisonment.
 Nor did appellant forfeit his contention underBlakely and Cunningham. Appellant was sentenced under the then-governing authority of People v.Black (2005) 35 Cal.4th 1238 (Black), which held that Blakely was inapplicable to the selection of the upper term, and which was reversed on this matter inCunningham. (Cunningham, supra,127 S.Ct. at p. 871.) Accordingly, any objection based on Blakely
would have been futile.
 Citing People v. Hill (2005)131 Cal.App.4th 1089, respondent contends that appellant has forfeited his contention under Blakely. We disagree. InHill, the defendant was sentenced afterBlakely but before Black, and the court concluded that his failure to raise an objection underBlakely at the sentencing hearing worked a forfeiture. (Id. at p. 1103.) Unlike the situation inHill, any such objection by appellant would have failed.
 2. Analysis
 We therefore turn to the merits of appellant's contentions. Generally, only one aggravating factor, if proper, is sufficient to support the selection of the upper term. (People v. Osband (1996) 13 Cal.4th 622, 732.) Because both factors cited by the trial court are facially infirm, we conclude that the matter must be returned to the trial court for resentencing.
 Our inquiry is controlled by Blakely andCunningham, which establish that appellant was entitled to a jury trial on the facts supporting the selection of the upper term, with the exception of those facts that the trial court is permitted to determine under Apprendi v. NewJersey (2000) 530 U.S. 466 (Apprendi). (Blakely, supra, 542 U.S. at p. 301; Cunningham,supra, 127 S.Ct. at pp. 860, 871.) In Apprendi, defendant's sentence had been doubled because the trial court found the crime to have been motivated by racial animus. The court held that the doubling was improper because "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Apprendi, supra, at 530 U.S. at p. 490.) As the court explained in People v. Thomas (2001)91 Cal.App.4th 212, 221-222, numerous courts have concluded that the "prior conviction" exception in Apprendi applies to a variety of issues closely related to a defendant's convictions, including, for example, whether the defendant is a recidivist by virtue of prior crimes, whether the defendant committed a new offense within a certain number of years of being released from prison, and whether the defendant served a prior prison term.
 In our view, the trial court's determination that appellant posed a substantial danger to others falls outside theApprendi exception. This determination, on its face, is a prediction that appellant is likely to endanger others inthe future, and thus it extends well beyond the facts tethered to his prior convictions. Because it contravenesBlakely and Cunningham, it cannot support the selection of the high term.[10]
 The trial court's determination that appellant had served prior prison terms, though proper underApprendi, is infirm for a different reason. Section 1170, which governs the selection of the upper term, bars the "dual use" of certain facts for this purpose. (People v.Bowen (1992) 11 Cal.App.4th 102, 105.) It provides that the trial court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b); see Cal. Rules of Court, rule 4.420(b).)
 Here, the record establishes that appellant had served a prior prison term for robbery, and concurrent prison terms for receiving stolen property and making terrorist threats. Because the trial court imposed one-year enhancements for the prison terms imposed in connection with the convictions for robbery and receiving stolen goods, it could not properly select the high term on the basis of these two prison terms. Accordingly, the trial court erred in citing multiple
prison terms as a basis for its decision.[11]
 Because both reasons the trial court cited for selecting the upper term are unsound, we conclude the matter must be remanded to the trial court. Upon remand, the trial court may exercise its discretion in selecting the base term on the basis of any facts falling within the Apprendi
exception.
 E. Presentence Custody Credits
 Appellant contends the trial court miscalculated his presentence custody credits. The trial court awarded appellant credit for 250 days of actual custody and an additional 50 days for good conduct. Appellant argues that he is entitled to credit for 285 days in actual custody, plus conduct credit of 142 days. Respondent agrees. We conclude that appellant's presentence custody credit must be corrected to reflect a total of 427 days, consisting of 285 days of actual custody, plus 142 days of good time/work time credit. The abstract of judgment shall be amended to reflect the appropriate credits. *Page 738 
 DISPOSITION The judgment is reversed with respect to the imposition of the upper term on appellant's conviction under section 273.5, subdivision (a), and the matter is remanded for resentencing in accordance with this opinion. Upon resentencing, the trial court is directed to prepare an amended abstract of judgment reflecting the changes in appellant's presentence custody credits described above (see section E, ante) and to forward it to the Department of Corrections. In all other respects, the judgment is affirmed.
 Epstein, P. J., and Suzukawa, J., concurred.
[1] All further statutory citations are to the Penal Code.
[2] In People v. Marsden (1970)2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44], our Supreme Court held that if a defendant seeks to have new counsel appointed, the trial court must inquire into the bases of the defendant's dissatisfaction and exercise discretion in deciding whether to grant the defendant's request.
* See footnote, ante, page 720.
[3] "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was `deficient' because his `representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a `reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (Peoplev. Jennings (1991) 53 Cal.3d 334, 357.)
[4] The version of CALJIC No. 2.27 advocated by appellant contains language appropriate only when corroboration of a witness's testimony is required. (Use Note to CALJIC No. 2.27 (2006), p. 60.) As we explain in the text, no such requirement was applicable to Verdugo's testimony. Accordingly, we omit the language in question.
[5] CALJIC No. 2.13, as provided to the jury, states: "Evidence that at some other time a witness made a statement or statements that are inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. [¶] If you disbelieve a witness's testimony that he or she no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by him or her describing that event."
[6] CALJIC No. 2.21.1, as provided to the jury, states: "Discrepancies in a witness's testimony or between a witness's testimony and that of other witnesses, if there were any, do not necessarily mean that any witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon. Two persons witnessing an incident or a transaction often will see or hear it differently. You should consider whether a discrepancy relates to an important matter or only to something trivial."
[7] CALJIC No. 2.21.2, as provided to the jury, states: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."
[8] CALJIC No. 2.22, as provided to the jury, states: "You are not required to decide any issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which you find more convincing. You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other. You must not decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. The final test is not in the relative number of witnesses, but in the convincing force of the evidence."
[9] At the prosecutor's request, the trial court struck the allegation in the amended information that appellant's robbery conviction constituted a strike.
[10] Respondent contends that the trial court's reliance on this finding is harmless error under Chapman.(Washington v. Recuenco (2006) ___ U.S. ___ [126 S.Ct. 2546, 2553] (Recuenco) [applying Chapman
analysis to Blakely error].) The crux of this contention is there is no reasonable doubt that a jury would have found that appellant posed a danger to others. We are not persuaded. Under Blakely, appellant was entitled to have a jury render a finding about his potential danger to others, and to have this finding established beyond a reasonable doubt. (Cunningham, supra, 127 S.Ct. at pp. 863-864.) Although appellant had notice that the trial court was authorized to determine whether he posed "a serious danger to society" as an aggravating factor (Cal. Rules of Court, rule 4.421, subd. (b)(1)), that this finding could be made on the preponderance of the evidence (Cal. Rules of Court, rule 4.420(a)) necessarily discouraged appellant's presentation of evidence on the matter. Indeed, at the sentencing hearing, appellant suggested that the record of his criminal convictions omitted evidence favorable to him. As the United States Supreme Court indicated in Lankford v. Idaho (1991)500 U.S. 110, 127, "there is an increased chance of error" under such circumstances. We therefore conclude that the trial court's finding is not harmless under Chapman.
[11] In reaching this conclusion, we do not address or resolve whether the trial court could have properly relied on appellant's prior prison term for making terrorist threats. *Page 739